Common Pleas Court of Hamilton County.

PHILLIP BLOOM *v.* MEYER HEINES.

Decided August 3, 1929.

*Pogue, Hoffheimer & Pogue,* for the plaintiff and defendant Savin.

*Dinsmore, Shohl & Sawyer,* for defendant Heines.

SHOOK, J.

By order of the Court this cause is consolidated with that of No. A-9456, and is to proceed under the above title.

Harry Savin, by order of this court, on motion of defendant Meyer Heines, has been made a party defendant.

Distinguished counsel on both sides has filed capable and forceful briefs. We have considered the several arguments and all of the authorities cited, as well as the

record developed in this case, including the pleadings and various exhibits. At the outset it is necessary to state that the feeling exhibited among the various parties was of such a character as to make it necessary for the Court to scrutinize all of the evidence with extraordinary care in determining the credit to be given the testimony and to give credit accordingly.

Substantially, the facts are that plaintiff, Phillip Bloom, the defendant Harry Savin, and Max Greenwald, entered into a contract to purchase certain Florida land described in the pleadings for the sum of thirty thousand dollars, on certain terms and conditions which are not material to our conclusions. Later Greenwald, by and with the consent of Bloom and Savin, withdrew from the contract, and on or about June 30, 1925, the contract of purchase was completed by Bloom and Savin. Harry Savin is the uncle of Meyer Heines. The defendant Heines went to Florida in the latter part of May or early part of June, and on June 2, 1925, purchased the property owned by Savin and Bloom for the sum of forty-five thousand dollars, through George Miller, who was a real estate agent, and who had negotiated the sale of the property to Greenwald, Bloom and Savin for thirty thousand dollars. One thousand dollars cash was paid by Meyer Heines on June 2, 1925, and fourteen thousand dollars more was paid on July 2, 1925, and three notes were given for twenty-five hundred dollars each, due in one, two and three years after July 2, 1925, together with the assumption of mortgages amounting to $22,500.00 covering the entire transaction of $45,000.00. On July 28, 1925, defendant Heines obtained a thirty day option from Albert Manowitz and others to purchase this same tract of land for $60,000.00, $3,000.00 being paid as a deposit, which was to be forfeited if the purchasers failed to exercise their option. George Miller, the real estate broker above referred to, handled this transaction also. However, the option was not exercised, and the $3,000.00 was forfeited. The interest on the notes in this litigation becoming due on January 2, 1926, was paid by the defendant Heines. During August, or the early part of

September, 1926, a disastrous storm occurred in this section of Florida, and real estate values collapsed. Thereupon, on September 29, 1926, the defendant Heines addressed a letter to plaintiff rescinding the purchase of these forty acres of land in Dade County, Florida, tendering a deed and demanding the return of the purchase money paid, and the return of the notes sued upon herein, and for the cancellation of any assumption of mortgages existing upon this land, which he assumed when he purchased the same.

In passing, it is necessary to note that Max J. Greenwald filed a suit in September, 1925, against Harry Savin and Phillip Bloom, known as cause No. 196,735, asking for an account of the purchase price obtained by the defendants and for judgment against them for any balance found due him. Thereupon, in January, 1926, defendants filed an answer in which, among other admissions, they alleged that they entered into a written contract with defendant Meyer Heines for this particular real estate setting out in some detail the consideration and other facts pertinent to the case. Plaintiff subsequently dismissed this suit at his costs.

Shortly after, according to this record, Meyer Heines' brother learned of the connection of Harry Savin with the transaction and defendant Heines had knowledge of the same in May or June, 1926. The property in this transaction appeared in the name of Phillip Bloom. Nowhere does it appear that Harry Savin had any connection with the same. The uncle, Harry Savin, was 56 years old, and his nephew was 28 years old, at the time of this transaction.

It is contended by plaintiff that there was no fiduciary relationship by and between the uncle and nephew; that the young man went to Florida to seek a fortune and took his chances speculating in real estate. It is conceded that prices were fluctuating tremendously. It is contended on the one hand that the uncle is an uneducated man of little schooling and that the nephew is a bright, energetic, educated young man, that no transaction of a business

nature had ever transpired between them and that the young man had never relied upon the older one in a single transaction. It is further claimed by Harry Savin, the uncle, that his nephew went to Florida of his own volition, that he did not expect to see him, that he refused to advise him, and that he, the nephew, employed Miller as agent, that the nephew speculated with the property and had an option, which, if it had been exercised, would have given the nephew a profit of $15,000.00 within thirty days thereafter. That no complaint was ever made, either directly or indirectly, of fraud or improper practice in the transaction until after this disastrous storm, which wiped out the profits, and that but for such disaster, no claim of fraud would ever have been made.

On the other hand, it is claimed that the record shows that the relationship was close between the nephew and his uncle, that Meyer Heines' father was not successful in business, but that Harry Savin, his uncle, had been prosperous and was a man of keen business insight, that the defendant's mother and her brother, Harry Savin, frequently came into contact, that they lived near each other in Cincinnati, and that the defendant Meyer Heines was a traveling salesman, but when he returned to his home at intervals he would often talk to the uncle and receive advice, or at least, had great admiration for his judgment; that he wired his uncle in Florida that he was coming there, although this wire was never produced, the uncle denying that he received the same. It is conceded that Harry Savin at no time informed Meyer Heines that he was connected in any way with this property, nor that he had any interest in it whatsoever, it being the claim of Harry Savin that he did not know that his nephew had decided upon this particular tract involved herein, until after the sale had been concluded.

We feel that we should apply as the proper rule in deciding whether or not fraud was exercised by the defendant Harry Savin, the principles set forth in the cases of *Christmas* v. *Spink*, 15 Ohio, 600, and *Merrick* v. *Ditzler*, 91 Ohio St., 256. The syllabus in the case of *Christmas* v. *Spink* reads:

"A court of chancery will not set aside a conveyance upon allegations of fraud unless the charges are clearly and satisfactorily sustained by the proof."

We further follow the rule in the *Merrick* v. *Ditzler case*, that where the charge of fraud is involved, the proof must be clear and convincing.

Bearing in mind these rules, we find that the record shows by clear and convincing evidence that the relationship between the defendant Harry Savin and his said nephew, was very close since the time of the birth of this defendant Meyer Heines; that while it is true that the defendant Meyer Heines was impeached in part of his testimony, it is likewise true that Harry Savin was impeached. Further, that there is so much personal feeling between these parties, which unfortunately often develops in a quarrel among close relatives, that we do not deem it wise, nor necessary, to quote these various discrepancies in detail. We have before us the record, which we have analyzed, and have also before us the briefs, in which counsel quote freely from the record. We agree with distinguished counsel for plaintiff and defendant Harry Savin, that the fact that Harry Savin was the uncle of defendant Meyer Heines, does not raise an inference of fraud, but we do not agree that the said defendant Harry Savin was not obliged to disclose to Meyer Heines his connection with this property.

The record shows clearly and convincingly, to our mind, that defendant Savin, and his associates, used Miller (to give plaintiff the most favorable consideration of the record) to induce defendant Heines to purchase this property, so that plaintiff and the uncle of defendant Heines could make a profit of $15,000.00. Subtlety, cunning and concealment are usual elements in fraudulent conduct.

We find from the record that Harry Savin is a man of business, well trained and successful; we find that his relations looked upon him as a successful business man; and respected him as such; we find that while there is nothing in and of itself improper in the fact that the property was taken in the name of Bloom, nevertheless,

under all the surrounding circumstances it became necessary for Harry Savin to divulge his interest in, and connection with, this property. Assuming he did not go to the property with the real estate agent Miller, nevertheless, he kept silent after he was informed that the deal was closed.

A fair analysis of the record divulges that Mr. Savin knew that his nephew was coming to Florida; that the said Harry Savin obtained for his nephew the same real estate agent who had represented him and his associates; that Mr. Savin procured or recommended the lawyer to examine the title; and that the warranty deed contains a notation that it was to be returned to Harry Savin, 603 Mercantile Library Building, Cincinnati, Ohio. The bill from the lawyer, Hamel, was sent to Harry Savin. The record shows (p. 92) that the deed from Bloom to Heines was recorded on July 6, 1925, and the deed from the Automobile Funding Company to Phillip Bloom was filed July 7, 1925; that the relations between Harry Savin and the defendant Heines were close is supported by the testimony of the sister Mrs. Bessie Heines. On page 91 is the following question and answer:

"Q. Now coming to a period we will say prior to May 1925, what was the relationship existing between your brother Harry and yourself, just tell us, was his manner friendly or otherwise?

"A. Our relations were very close; as often as my son would come in off the road we would always try to be together."

Furthermore, Samuel Savin, brother of Harry Savin, testified (Rec. p. 86) that the relations between Harry Savin and his sister were very pleasant, close and affable. On p. 88 is the following question and answer:

"Q. State whether or not something was said by you to the effect that he should not have made this deal with Meyer Heines without disclosing to him that he had an interest in it?

"A. I said that he should have told him that he had an interest in the property."

Also:

"Q. What did he say?

"A.   He said it didn't matter, he didn't have to tell him that he was the owner, that he probably would feel inclined not to buy it if he knew it."

And further he answered more specifically (Rec. p. 89) "he said if he hadn't sold him somebody else would have."

And further on page 89 Sam Savin testified that he and his brother had not spoken since this deal took place. In fact, it is conceded (Rec. p. 95) by Harry Havin that ever since he got back from Florida, he and his brother Sam have not spoken.

In view of the various steps in this transaction, the several explanations of defendant Harry Savin are not convincing; we find the following (Rec. p. 75):

"A.   I didn't know that Meyer was going to buy it until he bought it; Mr. Bloom told me when he got the check; he said 'do you know who bought that' and I says 'who' and he says 'Meyer Heines.'

Likewise, with reference to the balance of fifteen thousand dollars to be paid by Meyer Heines, see the testimony of Harry Savin (p. 75) that Meyer always worked with Bloom about that, and that he had nothing to do with it.

Counsel for plaintiff agrees that the cases cited by counsel for defendant properly state the law, the contention being that they have no application to the facts in this case.   The basic argument of counsel for plaintiff and defendant Harry Savin is that there is no evidence in this case showing a fiduciary relation to exist on the part of Savin.   Counsel argues that there is no proof of a relationship of principal and agent, or of trustee and *cestui que* trust, or of any relationship such as exists between parent and child, or attorney and client.

We have come to the conclusion that Harry Savin acted in the capacity of agent for Meyer Heines, and the latter also placed great confidence in his uncle, and this necessarily resulted in a fiduciary relationship by which there was imposed upon Harry Savin the obligation to make a full disclosure of any financial interest he might have in

this property. Had Harry Savin informed his nephew of the facts, and the nephew had said that he would take a chance, or that it was all right, that he felt he could make a profit in view of the excitement concerning real estate in this locality, there could be no question of fraud.

It has been vigorously contended by plaintiff that the fact that defendant Meyer Heines left the details of this closing of the transaction with a bank showed that he was not relying upon his uncle, and did not have that confidence in his uncle which he claimed. Mr. Phillip Bloom testified (Rec. pp. 52, 53) that "Meyer Heines left everything with the bank and he left his attorney to attend to it for him." But it must be borne in mind in this connection that Harry Savin recommended him to his lawyer.

We have tried to view this record from various angles; any way we approach it, however, we are convinced that the whole transaction was tainted with fraud. We quote the following answer made by Harry Savin (Rec. pp. 63, 64):

"A. And I says 'Meyer, there isn't anything that I can tell you' and he looked at me and he says 'why' and I says 'there isn't anything I can tell you,' and then he starts to walk out from the lobby and going as far as to the door to walk out, and he comes back and he says 'Uncle, I have lots of friends in Florida, so I believe I will have confidence in them what they say' and I says 'all right, Meyer, but be careful.' Well that was all. When he got back in the evening he says to me 'Uncle, I have seen a couple of friends of mine' he says, there was a couple of them and he was telling me he used to go with a girl in Cincinnati and this girl was married to a fellow in Florida, and they will tell me all about it. That is what he said and I says 'all right.' And he says 'will you go along with me tomorrow,' and I says 'no,' and he says 'what is wrong,' and I says 'now I am going to tell you what is wrong; if I ever say anything to you for you to buy anything and it will turn successful I will be a good uncle, but' I says 'God forbid for me to tell you anything, Florida is good today and no good next day, and that is why I don't want to say anything.' "

In this answer the witness is attempting to convince the court that he was more than anxious that this nephew

should not be led astray, but he says nothing, and does nothing, to advise his nephew that he had an interest in the property which his nephew later purchased.

For fear that there may be some misunderstanding, we are not resting this opinion solely upon the finding that this was a fraudulent transaction because the uncle did not say anything to his nephew about his ownership or interest in the property, but we have considered likewise the close relationship existing between uncle and nephew, regardless of whether any other transaction had ever been completed between them or not. The superior business ability of the uncle, the referring of this young man to the real estate man, who was the agent for the uncle, and the referring of him to the lawyer who was the lawyer for the uncle, together with the Uncle's silence, and general attitude throughout, drives us inevitably to the conclusion at which we have arrived.

The testimony of Phillip Bloom (Rec., pp. 56, 57) has struck us as affecting materially the attitude not only of Bloom but of the defendant Harry Savin:

"Q. And did you know when they told that it was Mr. Heines who was buying it, didn't you know that was the man you had seen with Mr. Savin, his uncle?
A. I did not know he was buying it.
Q. If you had known it before, would you have sold it to him?
A. Why not? I sell to my own son too.
Q. To your own son for $45,000?
A. Yes, sir, if I had a chance to make money, and I sell lots of times to my son and he sells again and he makes money too. Lots of property I sell to my own children, and they make more money than I did.
Q. If you had known that Mr. Heines was buying that and you and he were the only two people appearing in the contract, would you have told him that his uncle was also a partner in that transaction?
A. If he would ask me, yes. He never asked me anything but if he would ask me I would tell him, sure."

Certainly this sort of attitude has never been upheld, nor will it be countenanced, by any court of justice. This general feeling that it was legitimate to make this profit,

regardless of relationship or duties or obligations, seems to permeate the whole transaction and the actions not only of Harry Savin, but plaintiff as well.

The following citations show the uniform rule is situations of this sort:

*Devine* v. *Cibula* (Cuyahoga County Court of Appeals), 2 O. L. A., 220. The conclusion of the court is as follows:

"A real estate agent owes to his principal the unqualified duty of exercising fidelity and good faith, and is not entitled to make a secret profit as agent. The evidence in this case discloses clearly that the purpose of having the conveyance made to Mrs. Cibula was solely to keep plaintiff in ignorance of the fact that the property was immediately resold for $7,500 and to cover up the profit of $1,000. In equity and justice this mortgage is a property of Devine, and must be executed to her."

Ohio Jurisprudence, VI, 1, p. 758, Secs. 82-89, at p. 769 is the following:

"PERSONAL PROFIT.—An agent owes to his principal an unqualified duty of exercising fidelity and good faith, and it follows, as a universally recognized rule, that an agent may not, acting as such, make a secret personal profit out of any transaction wherein he acts, or should act, for his principal, without full and fair disclosure to the principal. The law certainly will not permit him to make a profit by acting in the double capacity of agent and purchaser."

48 A. L. R., 917.

*Quinn et al.* v. *Phipps*, 54 A. L. R., 1173, see the following quotation at p. 1173:

"Fiduciary relations, 1—what constitute.
2. The term 'fiduciary or confidential relation' is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confidence has been reposed and betrayed. The origin of the confidence is immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies upon another. (See 12 R. C. L., 234, 5 R. C. P., Supp. 637, 638.)
TRUSTS. 37—Abuse of confidence.

3. If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief. (See 12 R. C. L., 232; 2 R. C. L. Supp., 1406; 5 R. C. L. Supp., 637.)

FRAUD. 1—Acts control.

4. The principal to a business transaction is bound by his words and deeds rather than by a concealed purpose in his mind, on which he subsequently chooses to act, to the detriment of one to whom he owes loyalty and good faith."

See also the following Ohio cases:

*Maxwell* v. *Ford*, 110 O. S., 347.
*Rolling Stock Co.* v. *R. R.*, 24 O. S., 450, at p. 461.
*Yeoman* v. *Lasley*, 40 O. S., 190.

It is argued, however, that the conduct of defendant Heines, in failing to complain of fraud until after the storm, although he had known for about four months that his uncle had an interest in this property, his failure to write or to go to his uncle until after he had seen his lawyer in September; in fact, his entire conduct as shown by the record, acts in effect as an estoppel. After considerable reflection upon this angle of the case, we have come to the conclusion that, bearing in mind the family relationship between the parties, the natural reluctance to make a claim of this sort against a relative, the fact of the considerable difference in age and superior judgment of the uncle, are some valid reasons for the delay. The fact that the storm occurred, and probably precipitated this litigation, is not inconsistent with our conclusions.

Several Ohio cases dispose of the suggestion of laches on the part of Meyer Heines:

The case of *Telling* v. *Sullivan*, 14 C. C. (N. S.), 1, applies. The syllabi read:

"1. A bank official who gratiously engages to find a purchaser for certain stock owned by a customer of the bank, thereby becomes the agent of said customer and cannot thereafter himself become the purchaser of said stock without full disclosure of that fact to his principal and the latter's assent thereto.

2. Mere lapse of time short of four years from the discovery by the principal that the agent bought the stock for himself, will not bar an action in equity for the restoration of the stock, notwithstanding meanwhile it has greatly increased in value."

*Russell* v. *Fourth Natl. Bk.,* 102 O. S., 248, is a well considered case which reviews a number of authorities on this subject. We quote from pp. 265-267:

"This is a proceeding in equity, and it is a familiar doctrine that without reference to any questions of statutory limitation, a court of equity will discourage laches and delay in the enforcement of rights.

Bouvier defines laches:

'Unreasonable delay; neglect to do a thing or to seek to enforce a right at a proper time. * * *

'The neglect to do what in law should have been done, for an unreasonable and unexplained length of time and under circumstances permitting diligence.' * * *

'Unlike a limitation, it is not a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced.'

In *Harris* v. *Wallace Mfg. Co.,* 84 O. S., 104, with reference to this question it is said: 'If this point is well taken the others need not be examined further. To this point the oft-approved statement of Lord Camden in *Smith* v. *Clay,* 3 Bro. C. C., 640, is appropriate: 'A court of equity which is never active in relief against conscience or public convenience has always refused its aid to stale demands where a party has slept upon his rights and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith and reasonable diligence.' Indeed the fundamental truth has found a condensed expression in the familiar maxim, equity aids the vigilant, not those who slumber on their rights. The restraining influence of that maxim may be seen throughout the administration of equitable relief. It regards the just and important considerations that rights should be asserted before lapse of time may have added to the difficulty and uncertainty in judicial inquiry, and before acquiencence may have encouraged the adverse party to so change his position with respect to the subject that the enforcement of the right would impose unnecessary loss or hardship upon him.'

In 10 Ruling Case Law, 396, it is said: 'Its object is in general to exact of the complainant fair dealing with

his adversary, and the rule was adopted largely because after great lapse of time, from death of parties, loss of papers, death of witnesses, change of title, intervention of equities, or other causes there is danger of doing injustice, and there can be no longer a safe determination of the controversy.' "

The following language is found on p. 268:

"Where delay exceeds the time fixed for suit at law by an analogous statute of limitations, the burden is on the plaintiff to explain the delay and to show that it would be inequitable to enforce the doctrine of laches."

For the foregoing reasons the several prayers of the cross petition of defendant, Meyer Heines, are hereby granted. An entry should be presented accordingly.

Common Pleas Court of Ross County.

CHESAPEAKE & HOCKING RAILWAY CO. V. ORR.

Decided August 20, 1929.

*W. G. Hyde,* and *Wilson & Rector,* for plaintiff.
*J. D. Withgott,* for defendant.